**BRESSNER RADIO, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 18, Docket 25077.**

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1958.

Decided May 28, 1959.

Bernard Weiss, New York City, for petitioner.

Meyer Rothwacks, Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before HINCKS, LUMBARD and MOORE, Circuit Judges.

MOORE, Circuit Judge.

The taxpayer (petitioner) petitions for review by this court of a decision of the Tax Court deciding that there were deficiencies in income tax for the fiscal years ending May 31, 1948 and May 31, 1949 of $16,779.08 and $43,196.24 respectively and an overpayment of $4,401.55 for the fiscal year ending May 31, 1950.

The petition presents the question under the Internal Revenue Code of 1939 whether or in what circumstances a taxpayer who has long employed the accrual method of accounting may defer the inclusion in income of prepaid revenues on contracts to render future services over a twelve month period subsequent to the date of receipt.[1] The Commissioner asserted a deficiency for the fiscal years ending May 31, 1948, 1949 and 1950 on the ground that "the method employed does not clearly reflect the income" of petitioner, § 41, Internal Revenue Code of 1939, 26 U.S.C.A. § 41, and demanded the inclusion of all revenues in gross income in the year of receipt in place of the taxpayer's prorata monthly deferral. The Tax Court agreed with the Commissioner that the taxpayer's deferral technique did not clearly reflect its income, and found the above stated deficiencies.

The facts relevant to the decision are as follows. Petitioner, a New York corporation, was in the business of selling radios, television sets, air conditioners, refrigerators, washing machines and household appliances. Its books were kept on the accrual basis of accounting and its income tax returns in question were filed on that basis for the fiscal years ending May 31, 1948 through 1951. During these years petitioner sold a substantial number of television sets and in connection with the sale (undoubtedly as an inducement therefor and to meet competition) entered into a large number of written service contracts entitled "Service Contract for Television Receiver." Petitioner thereby agreed "to service the television receiver * * * and to furnish to the purchaser all labor, replacement of parts and tubes * * * necessary to provide proper operation * * * for a period of [12 months] from the date of this contract. * * * *" The average price received per contract was between $80 and $100. Payments were made by the purchasers in installments but the contracts were sold by petitioner to a bank for cash. Petitioner's initial cost of installation, which was covered by the contract, was approximately $19, which consisted of $7 for antenna, $10 labor and $2 clerical overhead.

Television sets sold in those comparatively early years had many defects. They required a substantial number of service calls both for the set and for adjustment when new stations commenced telecasting. Petitioner's actual experience showed that 8 to 12 service calls were made during the twelve months in which each contract was in force. Therefore, petitioner "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer" (Sec. 41)[2] allocated 25% of the service contract price to the installation cost and deferred the balance over the twelve month period of the contract.[3]

During the taxable fiscal years (1948 and 1949) the money received for the service contracts was not placed in a

---

1. Petitioner alternatively urged that if the prepaid amounts are held to be taxable income on receipt it is then entitled to accrue and deduct the estimated expense of rendering future services. In the light of the disposition of this case it is unnecessary to consider this contention.

2. Section references are to the Internal Revenue Code of 1939, 26 U.S.C.A.

3. Commissioner's brief on appeal concedes that "it was certainly *possible (even though it did not so happen in the years in question)* that the taxpayer's service obligations might have been fulfilled, at least in substantial part, in the taxable years in which the payments were made under the service contracts." [Emphasis added in parentheses.]

separate bank account and reserves were not set up on petitioner's books for expenses for servicing in subsequent years.

In each of the years of its business the total service contract obligations of petitioner were as follows:

| Fiscal year ended | No. of Contracts | No. of months of obligation | Months falling in: Current year | Following year |
|---|---|---|---|---|
| May 31, 1947 | 352 | 4,224 | 890 | 3,334 |
| 1948 | 1,248 | 14,976 | 6,585 | 8,391 |
| 1949 | 3,452 | 41,424 | 16,560 | 24,864 |
| 1950 | 6,274 | 75,288 | 32,598 | 42,690 |
| 1951 | 6,070 | 72,840 | 40,585 | 32,255 |

The actual cost per contract-month of servicing these contracts in the years ending May 31, 1948, May 31, 1949 and May 31, 1950 respectively was $9.81, $11.28, and $6.33.

These facts were found in substance by the Tax Court (28 T.C. 378).

Reference must be made to certain other facts which should be considered in passing upon the merits and the adequacy and accuracy of petitioner's bookkeeping system. These findings were requested by petitioner but denied by the Tax Court as not necessary in deciding the issues but the Court stated that they were fully considered in the preparation of its report.

To meet its obligation to replace parts and tubes petitioner maintained an inventory of service parts sufficient for a 60–90 days period having a value of between $10,000 and $25,000. Although no special fund was established for servicing, petitioner's cash balances were $47,-588.98 on May 31, 1948 and $110,997.83 on May 31, 1949. Thus petitioner kept in its possession cash and inventory in excess of the amount of the service contract receipts sought to be deferred, i. e., $41,281.66 and $128,406.35 respectively.

The solution of this tax problem depends upon construction of §§ 41 and 42 of the Internal Revenue Code of 1939. The primary difficulty in the case is presented by a potential conflict between these provisions. Section 41 provides

that "the net income shall be computed upon the basis of the taxpayer's annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer * * *" and thus points strongly away from the transactional or across-the-year approach for determining gross and net income for tax purposes. But § 42 creates an exception. It provides that "The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, *unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period.*" [Emphasis added.] Since the Commissioner contends that the taxpayer's method of deferral of unearned receipts on television service contracts is not one of the "methods of accounting permitted under section 41," the first question to be decided is the standard by which those methods which are acceptable may be identified.

Section 41 further provides that "If the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." This is the only enumerated basis upon which the Commissioner may disallow a method, and the problem therefore becomes to define the standard which must be applied to decide whether the method

adopted does or does not "clearly reflect" income.

The Revenue Act of 1913, 38 Stat. 166 (1913) provided only for a strict cash receipts and disbursements method of accounting. With the passage of the Revenue Act of 1916, 39 Stat. 756 (1916), however, apparently in response to mounting pressure from economists and businessmen to create some coherence in the relation between accounting for income and for income taxation, the accrual basis of accounting was permitted in language which has remained virtually unchanged since that time. Sections 8(g) and 13(d), 39 Stat. 763, 771. See H.R.Rep. No. 922, 64th Cong., 1st Sess. 4 (1916); May, Accounting and the Accountant in the Administration of Income Taxation, 47 Colum.L.Rev. 377, 380–381 (1947).

In United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347, the Supreme Court surveyed this legislative development and concluded that the changes of 1916 were made "to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period * * *" (269 U.S. at page 440, 46 S. Ct. at page 134). It applied this standard to require a taxpayer on the accrual basis to accrue in advance of payment taxes imposed for the year 1916 but payable in 1917. The principle has been expressly reaffirmed as recently as Lewyt Corp. v. Commissioner, 1955, 349 U.S. 237, 242–243, 75 S.Ct. 736, 99 L. Ed. 1029. The starting point, therefore, is the standard of "scientific accounting principles" to determine whether the deferral method adopted by the taxpayer here did or did not "clearly reflect" its income.

■■ In order to prevail, petitioner need only establish that the Commissioner improperly asserts that the method it has chosen and defends did not "clear-ly reflect" its income. Helvering v. Taylor, 1935, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623. This is not a case in which the taxpayer has sought to change its method of accounting and is therefore subject to the Commissioner's "wide discretion" to reject such a change. Cf. Brown v. Helvering, 1934, 291 U.S. 193, 204, 54 S.Ct. 356, 78 L.Ed. 725. This is rather a case in which an accrual taxpayer has from the start consistently applied the accrual method of accounting. Beacon Publishing Co. v. Commissioner, 10 Cir., 1955, 218 F.2d 697, 701–702.

■ As an accounting matter petitioner proved that the deferral of these receipts, assuming for the moment that the basis on which the deferral was computed was satisfactory, cf. Automobile Club of Michigan v. Commissioner, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed. 2d 746, did clearly reflect its income. The essential argument in support of the deferral is that although the customer's payment was *received* in full at the start of each year-long contract it could not be considered to be *earned* until petitioner had discharged its liability to perform services under the contract. At the close of each year petitioner did take into the income of the year such portion of the total received for each contract as, in accordance with its accounting procedures, it then considered to be earned, deferring the remainder of the receipt for inclusion in the year in which its remaining liability was discharged. It is not disputed that each contract did establish a continuing liability of petitioner to perform services at the customer's demand for one year.

In United States v. Anderson, supra, the Supreme Court held that:

"In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for purposes

of accounting and of ascertaining true income for a given accounting period, the munitions tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute * * [was] concerned, the taxes had accrued" (269 U.S. at page 441, 46 S.Ct. at page 134).

It is a necessary corollary of this "economic and bookkeeping" proposition that, until substantially "all the events" have occurred, both as to the cost and time of performance, which must occur in order to discharge the liability to perform which was given by petitioner in return for the receipt, the petitioner's "true income" would be distorted by the inclusion of the entire receipt in its year's revenues.

Furthermore, to compel this technique for tax purposes would further distort the result, in some cases grievously. Thus, in this case it was apparent to petitioner shortly after it commenced its service business that it would sustain a loss on each contract. Its accounting technique reflected a pro-rata portion of that overall loss in each of the years of performance. Had the petitioner adopted what the Commissioner asserts would have been the only proper accounting procedure for tax purposes it would have shown a first-year taxable profit on most contracts, and a second-year loss which would have been heightened by the tax cost imposed in the first. Thus if petitioner had sold a service contract for $100 on April 1, 1948 it would have incurred expenses of $19 for installation and $19.62 for servicing for two months ($9.81 × 2). The balance of $61.38 would have been taxable income in the fiscal year of the sale and would have resulted in a tax of $23.32 (at 38%). This would have left petitioner with $38.06 to meet his service costs over the next ten months of $98.10. We have no doubt that such a technique of reporting would be a gross distortion of petitioner's income.

The Commissioner relies on what he urges is a concept of income reporting established by the Supreme Court in construction of § 41 and its predecessors, which concept in his view supersedes customary accrual accounting rules as they relate to the time when receipts should be included in income. The proposition he urges is that sums received by a taxpayer without restriction on use must be reported in the year of receipt despite the fact that as an accounting matter they cannot be considered as earned in that year because they were received in return for the taxpayer's assumption of a liability to perform services in a subsequent year. He argues that only if such receipts are so reported will the method of accounting for tax purposes "clearly reflect the income" of an accrual basis taxpayer. He claims that this rule is an aspect of the "claim of right" doctrine for the existence and applicability of which he relies on a line of cases beginning with North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197, and including Brown v. Helvering, 1934, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; Spring City Foundry Co. v. Commissioner, 1934, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200, and more recently Heiner v. Mellon, 1938, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337; Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; United States v. Lewis, 1950, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; Healy v. Commissioner, 1953, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007; and Automobile Club of Michigan v. Commissioner, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746.

However, with the sole exception of Automobile Club of Michigan v. Commissioner, supra, not one of these cases deals on the merits with the question of the propriety of the deferral of prepaid receipts held without other restriction as to use than the liability to perform future services on demand. Therefore in order to establish his proposition the Commissioner must demonstrate that

these cases nevertheless establish a standard for the definition of those methods of accounting which are acceptable under § 41 that excludes the deferral of such unearned receipts. The cases individually or the so-called "claim of right" doctrine which they may collectively embody do not establish such a definition. To the contrary, in each of the cases cited which is relevant, the Supreme Court used as its starting point generally accepted methods of accrual accounting for earned income.

In North American Oil Corp. v. Burnet, supra, the government and the petitioner disputed the ownership of certain property, and a receiver was appointed pending a determination. In the year 1916 under the control of the receiver the property produced a profit. In 1917 the court battle was resolved in petitioner's favor at the trial level, and the receiver consequently paid over the sums representing the profit of 1916. The oil company sought to treat this profit, which it conceded was earned income in any event, as income in the year 1916. The Commissioner asserted that the fund constituted income to the company in 1917, when it first received it under a claim of right. The company countered with the argument that if the fund was not income to it in 1916, it could not be considered as income until 1922 when the right to retain it became final with the completion of all appellate processes. The Supreme Court dismissed the assertion that the income was taxable to the company in 1916 since it "was not required in 1916 to report as income an amount which it might never receive" (286 U.S. at page 423, 52 S.Ct. at page 615). As between the remaining years, 1917 and 1922, the Court held the income taxable in 1917. "If a taxpayer *receives earnings* under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent" (286

U.S. at page 424, 52 S.Ct. at page 615). [Emphasis added.]

It is plain that this case does not concern the question of the propriety of the deferral of unearned receipts. The petitioner asserted only that the existence of a contingency affecting its right either to receive or retain a fund which was concededly earned income should affect the year of inclusion of the income for tax purposes. The Court held only that money that was *earned and held under a claim of right* was includible in the year of receipt. The question presented here is very different. The petitioner asserts here that it has received a fund which it will not have earned until a subsequent tax period, and claims the right to defer its inclusion until it is earned so that it can be matched with the expenses incident to the production of the revenue in accordance with a scientific and regularly established accounting procedure. The real issue raised by the facts but not argued in the North American case from an accounting standpoint was whether a corresponding reserve to meet the contingency of the need for repayment could, if it were a sound accounting technique, constitute a deduction in 1917, the year of inclusion of the income. This issue was not actually presented until later; and the North American case itself cannot even be said to stand for a departure of tax accounting from sound general accounting practices.

In Brown v. Helvering, supra, the issue not argued in the North American case was presented, and the significance of the earlier holding for present purposes was clarified. The petitioner was an insurance agent which received from its principals so-called "overriding commissions" on policies that it sold. However, policies which were sold for a period in excess of a year were subject to cancellation on agreed terms and in the event of cancellation the petitioner was obliged to rebate a portion of the overriding commission it had received.

Petitioner's argument was in the alternative. First it sought to accrue as a deductible expense in the year of re-

ceipt and inclusion of the income a reserve to cover the contingent liability to return a portion of the commission. The Commissioner disallowed the reserve and was sustained by the Supreme Court on the ground that the reserve itself was improper for tax purposes because "the liability * * * arising from expected future cancellations * * was not fixed and absolute," 291 U.S. at page 201, 54 S.Ct. at page 360, whether or not it was proper as a matter of conservative accounting procedures.[4]

The petitioner's alternative argument is more important here. It argued that because the overriding commission was "compensation for services rendered throughout the life of the policy" it "cannot be considered as earned until the required services have been performed," 291 U.S. at page 203, 54 S.Ct. at page 361, and therefore ought in some part to be deferred for inclusion in the income of future years. The Court disallowed the deferral on two grounds. First, the Board of Tax Appeals had concluded that there "is no proof that the overriding commissions contain any element of compensation for services to be rendered in future years," 291 U.S. at page 204, 54 S.Ct. at page 361, and consequently there was no showing that as an accounting matter the commissions were not in fact earned as are a seller's sales receipts despite subsequent returns. The Court's denial of the requested deferral was thus not a departure from but rather an insistence upon sound accrual accounting for earned income. See, Rothaus, Taxation of Prepaid Income, 17 Md.L.Rev. 121, 127 (1957). Alternatively the Court found that since petitioner had itself previously uniformly treated the commissions as income in the year of receipt, its assertion of the right to defer constituted a change of accounting procedures. It held that the Commissioner "was vested with a wide discretion in deciding whether to permit or forbid a change." 291 U.S. at page 204, 54 S.Ct. at page 361. As to this deferral issue it did not mention the "claim of right" concept or cite prior claim of right cases.

Here there is no argument whatever that the prepaid receipts as to which the deferral is sought were anything but unearned, and therefore as to the first ground of the decision against deferral in Brown the case is not in point. Moreover, here there was no change either in the petitioner's underlying method, which was concededly an accrual method, or in his treatment of receipts under service contracts, which from the start he has sought to defer.

The Commissioner urges that in any event Automobile Club of Michigan v. Commissioner, supra, establishes the applicability of the so-called "claim of right" doctrine to disallow deferrals of these unearned receipts. While this was true of the decision in the Tax Court, 1953, 20 T.C. 1033, and apparently of the decision in the Court of Appeals, 6 Cir., 1956, 230 F.2d 585, 586–587, the decision of the Supreme Court was placed on the far narrower ground that the particular method of deferral adopted by the Club was unsatisfactory. "The pro rata allocation of membership dues in monthly amounts is purely artificial and bears no relation to the services which petitioner may in fact be called upon to render for the member." 353 U.S. at page 189, 77 S.Ct. at page 712.

It is apparent from the decision of the majority that at least for purposes of the decision of the case it assumed that a realistic deferral would have been permissible, and found only that no realistic deferral was made. It thus did not pass on the issue which concerns us here. The Commissioner's treatment of the Club's receipts on a cash basis, which followed from his claim of right analysis, was permitted only *after* the Court determined that the Club's accounting

4. It has been suggested that a reserve out of income would have been improper because the liability to return was too contingent, and that the Court so held. See Freeman, Tax Accrual Acctg. for Contested Items, 56 Mich.L.Rev. 727, 735 (1958).

method did not clearly reflect its income. Nevertheless three Justices dissented from even this limited application of the claim of right to deferrals, despite the fact that the Commissioner has been held to have a very broad discretion to select the cash basis once he has shown the taxpayer's system to be inadequate. The majority appears to have proceeded from an assumption that accrual accounting would be acceptable tax practice.

The remainder of the cases expressly relied on by the Commissioner similarly fail to establish such a departure from sound accrual accounting practice as would justify the Commissioner's assertion that the petitioner's unearned receipts must be included in income because the method it adopted did not clearly reflect its income.

Spring City Foundry Co. v. Commissioner, supra, was simply an attempt to avoid by unsound accounting the non-deductibility of debts becoming partially worthless within the tax year under § 234 of the Revenue Act of 1918, 40 Stat. 1077. The taxpayer argued that since the income in the form of an account receivable was earned in the same tax year in which the receivable became partially worthless he should be allowed to net the amounts and show as income for the year only the remaining value of the debt. The Court in accord with accounting practice held that the earned income must be reported in the year in which it was earned; and then separately held that the Revenue Act did not permit a deduction for partial worthlessness. The case did not concern the accounting treatment of unearned receipts. In Heiner v. Mellon, supra, members of a partnership formed in order to engage in the liquidation of certain enterprises, sought to delay the reporting of income earned by the companies in liquidation until the completion of the liquidation when it could be determined whether the partnership enterprise of liquidation had been profitable. There was no claim that the contested receipts were not earned income. The taxpayer simply asserted the right to delay all accounting for certain earnings beyond its annual period, and both sound accounting procedure and the annual accounting concept of the Revenue Act prevailed over his transactional approach.

Security Flour Mills Co. v. Commissioner, supra, concerned the deductibility from concededly earned income of one year of payments made in subsequent years as to which no liability had accrued in the earlier years. This was an attempt to use the transactional approach as to liabilities. The Supreme Court disallowed the deduction because the taxpayer's accounting method was "a divided and inconsistent method of accounting not properly to be denominated either a cash or an accrual system" (321 U.S. at page 287, 64 S.Ct. at page 599). The taxpayer, who was on the accrual basis, had collected taxes from its customers in 1935. In the same year it contested its liability to pay over the amount of the tax to the government, but also took a deduction from income for an accrued tax expense. In the next year it won its dispute with the government so that in fact the taxes were not paid; but in the subsequent three years, it made rebate payments to its customers for the tax previously deducted. The Commissioner disallowed the 1935 deduction for the taxes which were not paid in 1935 or thereafter. The Board of Tax Appeals disallowed a portion of the Commissioner's result, computing the deficiency in 1935 by allowing the taxpayer to carry back to 1935 as a deduction the sums actually paid out to customers in 1936, 1937 and 1938. 1941, 45 B.T.A. 671. The Commissioner, but not the taxpayer, appealed from this method of determination of the liability in 1935, and the court of appeals reversed the allowance as a deduction in 1935 of the sums expended in later years. 10 Cir., 1943, 135 F.2d 165. The Supreme Court thus had before it only the hybrid calculation of the 1935 deduction, which, in accord with sound accrual accounting, it disallowed, affirming the court of appeals.

This case has nevertheless been mistakenly regarded on occasion as identical in issue and resolution to such cases as Dixie Pine Products Co. v. Commissioner, 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270, which have held that accrual taxpayers who refuse to pay taxes on the ground of their invalidity may not accrue and deduct the liability to pay them during the course of the dispute. See, e. g., Freeman, Accrual Accounting for Contested Items, 56 Mich.L.Rev. 727, 736 (1958). Even so regarded the case is consistent with sound accrual accounting, since, as in the Dixie Pine case, enough had happened by the time the accrual of the contested liability was sought, to render the need for ultimate payment highly unlikely and the accrual by the very person asserting non-liability at least arguably unsound. See Freeman, supra, ibid.

The other cases relied on by the Commissioner we think not at all in point. Although United States v. Lewis, supra, and Healy v. Commissioner, supra, both reaffirm the familiar annual accounting rule of § 41, both dealt with cash basis taxpayers, and neither concerned any issue of the propriety of techniques of deferral under § 42.

Therefore there is no basis whatever in the cited cases for the Commissioner's broad assertion that for tax purposes concededly unearned receipts must be regarded as income in the year of receipt, and there is nothing to indicate that in construing §§ 41 and 42 and their predecessors the Supreme Court has generally departed from the standard of sound accounting practice in determining what methods are authorized under § 41. Absent an express congressional command, a lack of congruency between the accrual methods authorized under § 41 and sound accounting practice must arise out of a demonstrable requirement of sound administration of the revenue laws. See, e. g., Commissioner of Internal Revenue v. Phipps, 1949, 336 U. S. 410, 69 S.Ct. 616, 93 L.Ed. 771. No such need has been demonstrated in support of the Commissioner's position, and no such congressional command has been cited. Indeed the command of § 41 is plainly to the contrary in a case such as this.

The final and crucial issue in this case is whether the pro-rata monthly deferral employed by the petitioner did "clearly reflect" income, or whether, as the Commissioner finally contends, it was "purely artificial" within the meaning of the Automobile Club decision. There is nothing apparently artificial about the petitioner's method of deferral here. Drawing on its experience with thousands of contracts it has demonstrated that it was subjected to a reasonably uniform demand for services, so that it could and did anticipate that the expenses incident to the performance which alone would entitle it to regard the sum received as earned would be distributed across the life of the contract. It therefore deferred revenues until they were earned, and thus matched them with foreseeably related expenses, which is the essential purpose of accrual accounting. United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347.

There are three grounds on which the Automobile Club case is distinguishable. Two of these relate to the impropriety there of deferrals of income where the amount deferred should properly have been treated as already earned even under an accrual system; and the third relates to the absence there of affirmative proof that the particular proration selected reasonably matched actual expenses with the earning of related revenues.

First, from the statement of the facts in the opinion of the court of appeals, 6 Cir., 1956, 230 F.2d 585, 586–587, it appears that while the Club deferred the entire amount received as membership dues on a pro-rata monthly basis, it expended only an undefined portion of it on services such as emergency road service, rendered on the member's demand, and spent the rest on continuing enterprises such as solution of safety and traffic problems, and promotion of certain laws favorable to motorists. Since

the continuance of these enterprises and the amounts to be invested therein were largely if not entirely within the discretion of the directors of the Club, its failure to allocate a portion of the membership fee to these enterprises and to defer only that part of the fee reasonably related to the services which it assumed a continuing liability to render on demand in the subsequent year might alone have been adequate grounds for holding that the deferral employed was "purely artificial" since it bore no reasonable relation to the continuing liability actually assumed.

Second, it appears from the record in the case, although it is not disclosed in the several opinions, that even the services which the Club actually did render "on demand" in the subsequent year could have been restricted or even discontinued in the Club's discretion. Since it also appears from the opinion of the Tax Court, 1953, 20 T.C. 1033, that there was no legal requirement that the Club refund previously paid dues when a member voluntarily terminated his membership, the right to retain the dues was fixed even though the very existence of any continuing liability to perform services "on demand" may have been in the control of the Club. In this circumstance it could be said to be "artificial" for the Club to defer as "unearned" even those amounts received from its members which the Club actually allocated to the performance it thereafter chose to render "on demand" in the subsequent year.

Finally, in addition to these grounds for considering the basis of the deferral improper, the Club's pro-rata monthly allocation may have been "artificial" because of a failure of proof that the actual expenses incurred in discharging the continuing liability assumed under the contract were in fact "matched" with related earnings by an equal monthly allocation of revenue. Particularly in a northern state such as Michigan it may well be that the undertaking to perform emergency service on demand is, over a large number of contracts, an undertaking to do far more in the winter months than at any other time during the year, so that an equal monthly proration of revenue would neither succeed in matching actual expenses with the revenues which they produce nor in reflecting the actual rate at which the income was earned. See Note, 67 Yale L.J. 1425, 1440 and n. 65 (1958). Whether or not accrual accounting for ordinary business purposes or for tax purposes requires more than a reasonable predictability of matching expenses with related revenues, see Freeman, Tax Accrual Accounting, 56 Mich.L.R. 727, 747 (1958), a complete failure of proof of at least a reasonable relationship between expense and revenue coupled with facts which themselves raise the inference that expenses are not reasonably constant during the year is a sufficient basis for the conclusion that the deferral adopted was "purely artificial." Whether one or all of these grounds produced the conclusion that the Club's monthly pro-rata allocation of revenues was "purely artificial," the case does not govern here.

In conclusion, petitioner's regularly employed method of accounting on an accrual basis and its deferral of income so that it most closely matched the corresponding expenses clearly reflected its true income. Its method and the statistical material supporting its figures were not "purely artificial." They bore a carefully estimated relationship to the services petitioner would be called upon to render. The record does not reveal a factual basis for permitting the Commissioner to adopt a method of his own on the ground that petitioner's method "does not clearly reflect income."

As an alternative argument petitioner urges that if service contract receipts are held to be taxable income when received, it should be entitled to accrue and deduct the costs incurred to earn the service contract receipts. It may well be that had petitioner regularly employed such an accounting method whereby from reliable experience reserves were set up to meet future costs such a method would have clearly reflected income. See Schuessler v. Commissioner.

5 Cir., 1956, 230 F.2d 722. But this is not the issue. The problem is not to decide what kind of a system the Commissioner, the Tax Court or the appellate courts might choose to have a taxpayer adopt. The sole question is: does the system actually employed clearly reflect income? Conversely, the question is not: would some other system have been better? Petitioner's accounting method met the statutory test.

The decision of the Tax Court should be reversed and the cause remanded to the Tax Court for the entry of an appropriate decision under Rule 50, Tax Court Rules, 26 U.S.C.A. § 7453.